## MEMORANDUM

The Court should grant Movant Paul Hansmeier's motion to unseal.

## I. Background.

In this case, which has now been closed for some time, Plaintiff AF Holdings LLC ("AF Holdings") alleged that Defendant John Doe violated its copyright in an adult work by copying the work via the BitTorrent file distribution protocol. Defendant's alleged infringement occurred via the Internet, so AF Holdings needed a court order to require John Doe's Internet Service Provider to disclose John Doe's identity. For more background on this procedure, Hansmeier would refer the Court to the district court's opinion in <u>Strike 3 Holdings, LLC v. John Doe</u>, No. 18-cv-773 (JRT/DTS) (D. Minn. Jan. 2, 2019).

The then-presiding Magistrate Judge, who would later reveal a disturbing political bias against pornography piracy lawsuits (more on this below), denied AF Holdings' motion aimed at discovering John Doe's[1] identity. The district court reversed the Magistrate Judge and the case was able to proceed.

[1] The lawsuit was styled as a "John Doe" lawsuit at its outset.

Importantly, for the purpose of this motion, the district court ordered AF Holdings to file under seal all of its communications with the Defendant. These are the documents that Hansmeier is seeking to unseal. To Hansmeier's understanding, these documents consist of copies of written correspondence and transcripts and/or recordings of phone communications. Hansmeier is seeking these documents so he can provide them to a reporter who is interested in reporting on Hansmeier's pornography piracy lawsuits and so he can use them in a variety of future proceedings. Some more background will provide the proper context for this motion.

To the best of Hansmeier's recollection, four of the five defendants settled; in the case that did not settle, the Internet Service Provider account holder was an elderly World War II veteran (whose grandson ostensibly misused the Internet connection) and AF Holdings out of respect for his service voluntarily walked away from the case. The cases were resolved and everyone moved on with their lives.

Then, on May 5, 2013, a district court judge with a giant

-2-

skeleton in his closet issued an order which evidenced his extreme disdain for anti-piracy litigation and mailed a copy of the order to every judge in the United States before whom Hansmeier and his colleagues had appeared.

Once he received a copy of the order, the Magistrate Judge (according to a speech he would later give) decided to initiate an ex parte investigation into the closed cases. As he would describe it, this investigation consisted of reading blogs written by pirates Hansmeier had previously caught stealing pornography and speaking to his clerks about how BitTorrent works. At the conclusions of his investigation, if it can be called that, the Magistrate Judge decided he was going to "stick it" to AF Holdings and everyone the pirate blogs said was associated with it.

The Magistrate Judge's end game from day one was to force AF Holdings to return the settlement payments. His first move was to invoke his Article III inherent powers to reopen the closed cases. Of course, the Article III inherent power is unavailable to federal magistrate judges, whose path to the bench does not have

-3-

the Constitutional trappings of nomination by the President and confirmation by the Senate. The Magistrate Judge's next move was to issue an order to show cause for why estoppel effect should not be given to given to the findings in the order issued by the district court with a giant skeleton in his closet. AF Holdings, through Hansmeier, filed a response pointing out a series of fairly obvious reasons why estoppel would be inappropriate under the circumstances. Apparently satisfied that he could not accomplish his objective via the estoppel device, the Magistrate Judge moved on to his next tool.

    The Magistrate Judge's next move was to get the John Doe Defendants to do his dirty work for him. He issued an order to appear, which included an order requiring multiple people associated with AF Holdings to appear from out-of-state, the basics of which ordered all of the parties to the case to meet with him in chambers. The Magistrate Judge convened the meetings and told the John Doe Defendants that he, in effect, would force AF Holdings to return settlement payments and award them their attorneys' fees incurred if they would just file a motion requesting that he order

-4-

that relief. Following the meetings the John Doe Defendants, through counsel, told the Magistrate Judge that they would decline to further participate in the proceedings.

With this setback, the Magistrate Judge had to regroup and find a new way to try and "stick it" to AF Holdings, Hansmeier and others. At the time of the Magistrate Judge's efforts, the validity of the assignee's signature on a copyright assignment of a work to AF Holdings was under-attack; the assignee had repudiated his signature and sued Hansmeier's law partner, John Steele, accusing Steele of forging the signature. Allegations of forgery are obviously a bad and terrible thing, but these allegations had nothing to do with the copyright infringement claim because under the Copyright Act an assignment springs into existence when there is a writing signed by the assignor (the assignee's signature is irrelevant). Apparently unaware of this law, or indifferent to it, the Magistrate Judge issued an order requiring AF Holdings to authenticate the assignee's signature on the copyright assignment at issue in the cases he was trying to unwind. The Magistrate Judge's angle was obvious to anyone who thought about it; he knew that the individual

-5-

who had repudiated his signature had an enormous financial interest in continuing to repudiate his signature. The Magistrate Judge also knew that his credibility determinations would be subject to highly deferential appellate review, making reversal on those grounds very unlikely. Over AF Holdings' objection, the Magistrate Judge held the sham hearing and, as expected, the individual continued to repudiate his signature. The Magistrate Judge took the matter under advisement.

While the matter was under advisement the Magistrate Judge scheduled a speaking engagement at the University of Minnesota. The subject matter of his now infamous lunch time lecture was the cases he had just taken under advisement. Anyone familiar with the Judicial Code of Conduct would recognize the enormous breach of ethics that occurs when a judge gives public remarks over matters that are pending before them. Making matters far worse, the Magistrate Judge's remarks were basically his victory lap over a form of litigation he found to be very distasteful; he had decided to take care of a problem as if our Constitution had concentrated the judicial, legislative,

-6-

and executive powers in this individual from Minnesota. Hansmeier was made aware of the Magistrate Judge's speech in advance of it and sent someone there to record it. Immediately after reviewing the transcript AF Holdings moved to disqualify the Magistrate Judge from further participation in the proceedings — which, of course, the Magistrate Judge denied.

As he said he would, the Magistrate Judge issued his order requiring AF Holdings to return settlement payments based on his finding that the _assignee's_ signature was invalid. AF Holdings immediately objected to the ruling and, to her great credit, the district court refused to accept the Magistrate Judge's order. The district court held that the Magistrate Judge lacked Article III inherent authority and even if this were not the case that the _assignee's_ signature is not relevant to the elements of copyright assignment.

In his final act of corruption in this case, the Magistrate Judge referred Hansmeier to the U.S. Attorney for the District of Minnesota for criminal prosecution for an investigation into who owns AF Holdings — even though the

- 7 -

issue was never material to the pretext invented by the Magistrate Judge.

## II. Argument.

Hansmeier seeks to disinfect the District of Minnesota via the sunlight provided by transparency in judicial proceedings. Brandeisian references aside, the Magistrate Judge behaved in a reprehensible, unethical and corrupt manner in this case. Although the Magistrate Judge is no longer among the living, the posthumonous destruction of his reputation will serve as a powerful deterrant against future corruption and misconduct within the ranks of the judiciary. And, it should be mentioned, there is no basis in the law for any of the parties to this case to argue that the records remain sealed; thus, there is no reason to seal or maintain a seal on any of the records in this case.

### A. Legal Standard.

Federal Rule of Civil Procedure 26 provides that a district court may seal the records in a proceeding, but only upon a finding of good cause. The

-8-

The term "good cause" is narrowly construed because the sealing of public records conflicts with the presumptive openness of judicial proceedings. It is not enough for the party seeking a seal on records to argue that public access to the records would result in embarrassment, annoyance or discomfort. Typically, a seal is appropriate only when a business trade secret is at issue or where public disclosure would result in a credible risk of physical harm. Sealing is also appropriate in cases involving a minor victim of sexual abuse.

### B. There is no legal basis to maintain a seal on any record in this case.

There is no legal basis to maintain a seal on any record in this case. Neither the plaintiff nor the defendant in this case should even try to argue otherwise.

#### 1. Hansmeier may move to unseal the records in this case.

Hansmeier may move to unseal the records in this case. Courts treat this issue differently, but most courts hold that any member of the public may move to unseal records without first moving to intervene. But even those courts which require some

statement of interest typically do not require much beyond a statement of interest as a member of the public. Hansmeier has this interest as a member of the public. This interest is strong in this case because Hansmeier seeks to use the sealed to assist reporting on an instance of judicial corruption in the District of Minnesota. The public has a strong interest in the exposure of misbehaving judges. The sealed records will assist this reporting because, right now, reporters have no idea if something crazy was happening in the sealed communications that would have justified the Magistrate Judge's otherwise unjustifiable behavior. It should not be overlooked that there are other parties that the Magistrate Judge may have victimized through corruption during his tenure as a judge; reporting on his corruption in this case may give the Magistrate Judge's other victims the courage they need to seek justice.

Hansmeier's interest is further strengthened by his desire to use the sealed documents in future judicial proceedings. Hansmeier is preparing to bring claims for restoration against the beneficiaries of a restitution judgment entered against him in the criminal case which

-10-

flowed from the Magistrate Judge's corrupt referral.

The foregoing is a subset of the reasons why Hansmeier has a sufficient interest in seeking the unsealing of the sealed records.

## 2. The records should be unsealed.

The sealed records should be unsealed. There is a strong presumption of openness in judicial proceedings and Hansmeier cannot imagine an argument that either of the parties could make in favor of maintaining the seal on the sealed records. Absent a showing by one of the parties for why the sealed records should remain sealed, the Court should order the records unsealed.

6/1/20

Respectfully submitted,

Paul Hansmeier
20953-041  Unit K3
FCI Sandstone
P.O. Box 1000
Sandstone, MN 55072

-11-